68 P.3d 1065 (2003)
149 Wash.2d 402
STATE of Washington, Petitioner,
v.
Armando Mayorga DeSANTIAGO, Enrique DeSantiago, Pedro Mendoza CArranza, Victor Carrillo Diaz, Elpidio Ramirez Reyes, Respondents.
State of Washington, Petitioner,
v.
Armando Mayorga DeSantiago, Respondent.
No. 71918-7.
Supreme Court of Washington, En Banc.
Argued September 24, 2002.
Decided May 15, 2003.
*1067 John Knodell, Grant County Prosecutor, Ephrata, for petitioner.
Antonio Salazar, Russell Abrutyn, Seattle, for respondents.
Elaine Winters, Washington Appellate Project, Seattle, amicus curiae on behalf of Wash. Assn. of Criminal Lawyers.
*1066 OWENS, J.
At issue in this case is whether the testimony of three key witnesses from the defendants' first trial, which ended in a mistrial, could be read to the jury on retrial without violation of the sixth amendment to the United States Constitution or ER 804. The witnesses were unavailable at the time of retrial, the former testimony is sufficiently reliable, and the defendants had similar motive when they cross-examined the witnesses at the first trial. Therefore, we hold that admission of the former testimony was proper.
In addition, the jury found that the defendants were armed with both a firearm (a gun) and a deadly weapon (a knife). The second issue here is whether one sentence enhancement for the firearm and a second sentence enhancement for the deadly weapon may be imposed for a single underlying offense. We hold that where a jury determines that a defendant was armed with more than one weapon, RCW 9.94A.510 unambiguously requires the sentencing judge to apply the proper enhancement for each firearm or other deadly weapon carried. However, the total sentence remains presumptively limited by the statutory maximum for the underlying crime.

FACTS
At the first trial, Eduardo Sanchez (E.Sanchez) testified that when he and Reina Serrano (Serrano) returned home on the night of February 19, 1999, a car blocked them into their driveway and three men appeared on foot from behind their house. The men put a gun to E. Sanchez's head and a knife to his ribs and forced him into their car. The kidnappers took him to a hotel in Kennewick, contacted his family, and demanded a ransom. After two nights they drove E. Sanchez back to Moses Lake, where his father, Jose Sanchez (J. Sanchez), delivered the ransom and E. Sanchez was released. E. Sanchez identified all five defendants: Enrique DeSantiago (E.DeSantiago), Victor Carrillo Diaz (Diaz), Pedro Mendoza Carranza (Carranza), and Elpidio Ramirez Reyes (Reyes) had abducted him, and Armando Mayorga DeSantiago (A.DeSantiago) had joined the group at the hotel.
Serrano testified about the abduction and the damage she found inside her home including cut phone lines, damage to the door, and open sodas in the kitchen. J. Sanchez testified that the kidnappers contacted him and Serrano after the abduction. At the direction of the police, J. Sanchez arranged an exchange of $11,000 for his son's safe return. Just after E. Sanchez's release, the defendants were arrested. Despite testimony from all three witnesses, the jury could not reach a verdict in the first trial.
Three days before the second trial, the court held an evidentiary hearing on the admissibility of the witnesses' prior testimony. The Grant County prosecutor explained that after the court set a new trial date, he mailed subpoenas to the family. A few days later, an anonymous family member reported that the family had moved. Both a detective and a family friend revealed that the witnesses had been reluctant to testify at the first trial and moved because they were afraid of the defendants.
The prosecutor assigned a detective to try to locate the missing witnesses. The anonymous family member explained that Serrano and the Sanchezes had moved to Mexico but refused to say exactly where they were. Although they reportedly considered moving to Texas, the detective could not elicit contact information for relatives there. The local family member persistently refused to reveal the family's location, despite four or five attempts to obtain further information.
*1068 The testimony of all three witnesses was admitted and read to the jury at the second trial. Several other witnesses also connected the defendants to the abduction. However, the defendants claimed that E. Sanchez willingly accompanied them to the hotel, no weapons were involved, and the two days were spent drinking beer in the hotel room. They also claimed that the payment from J. Sanchez was in fact a refund for a pickup truck, which Diaz had purchased from the Sanchezes but for which they had failed to produce a title. Any requests for money were demands for either the title or a refund.
On cross-examination, read from the first trial, Eduardo and Jose Sanchez denied knowing anything about the pickup. Yet, at the second trial, Diaz offered for the first time a Department of Licensing record indicating that shortly before the kidnapping, the Sanchezes were the owners of a 1990 blue Chevrolet pickup truck. Diaz's attorney had acquired the pickup truck registration on the day before the evidentiary hearing for the second trial. However, the defense did not bring the registration to the court's attention until three days into trial, long after the evidentiary hearing and after the Sanchezes' testimony had been read to the jury.
The jury found A. DeSantiago and E. DeSantiago guilty of kidnapping and the remaining defendants guilty of both kidnapping and burglary. The jury also returned a special verdict, finding that during the kidnapping, the defendants were armed with a firearm (the handgun) and a deadly weapon (the knife). At sentencing, the court imposed both a firearm enhancement and a deadly weapon enhancement on each kidnapping conviction. Thereafter, the Court of Appeals dismissed A. DeSantiago's prior convictions. At his resentencing, his new lawyer argued that both enhancements could not be applied to a single underlying offense, though he conceded that the longer firearm enhancement must govern. That judge agreed and removed the shorter deadly weapon enhancement from his sentence.
All the defendants assign error to the admission of the former testimony. E. DeSantiago, Diaz, Carranza, and Reyes assign error to the imposition of both enhancements to one underlying offense. The State assigns error to the removal of A. DeSantiago's deadly weapon enhancement. The Court of Appeals affirmed the convictions but held for the defendants on the sentencing issue. State v. DeSantiago, 108 Wash.App. 855, 881, 33 P.3d 394 (2001).

ISSUES
(1) Was the former testimony admissible under the confrontation clause of the Sixth Amendment and ER 804?
(2) Do both the firearm enhancement and the deadly weapon enhancement apply to a single offense committed with two weapons?

ANALYSIS

A. Former Testimony
The confrontation clause places two conditions on the admission of former testimony. The State must show that the declarant is "unavailable" at the time of trial and the statement must bear sufficient "`indicia of reliability.'" Ohio v. Roberts, 448 U.S. 56, 65-66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quoting Dutton v. Evans, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)). Similarly, ER 804(a)(5) mandates that the proponent of the hearsay statement must show inability to procure the declarant's attendance "by process or other reasonable means." Finally, former testimony of an unavailable witness is admissible only if the party against whom it is offered "had an opportunity and similar motive to develop the testimony by ... cross ... examination" when the witness testified. ER 804(b)(1). The former testimony in this case is inadmissible if it fails to satisfy either the confrontation clause or ER 804. A trial court's decision to admit evidence is reviewed for abuse of discretion. State v. Neal, 144 Wash.2d 600, 609, 30 P.3d 1255 (2001).
1. Unavailability. In Roberts, a witness was deemed unavailable for trial where the prosecutor had repeatedly attempted to serve her at her last known address, she had left the state, her relatives had been unable to contact her, and her whereabouts were unknown. 448 U.S. at 75, 100 S.Ct. 2531. *1069 The Roberts court recognized that the "good-faith effort" required of the State did not include futile acts having "great improbability [of] locating the witness." Id. at 75-76, 100 S.Ct. 2531. Likewise, in Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), the witness at issue was deemed unavailable because he had moved permanently to Sweden, making the state "powerless to compel his attendance." Id. at 211-12, 92 S.Ct. 2308.
Here, several attempts to find the witnesses at their last known address had failed. They were reported to be somewhere in Mexico, possibly planning to move to Texas. The State repeatedly contacted a family member who knew where the witnesses were but would not reveal their location. Any possible contacts in Texas also remained unknown. Because the witnesses were out of the country and could not be located, they were sufficiently unavailable to satisfy the confrontation clause.
ER 804(a)(5) requires a prosecutor to attempt to procure attendance "by process or other reasonable means." A prosecutor offering an "out-of-court statement of a witness beyond the legal reach of a subpoena" must show that he or she "made an effort to secure the voluntary attendance of the witness[ ] at trial." Rice v. Janovich, 109 Wash.2d 48, 57, 742 P.2d 1230 (1987). Here, the State did use reasonable means to locate the witnesses in order to secure voluntary attendance, but relatives refused to reveal their location in Mexico.
The defendants argue that the State should have done more to secure the witnesses' presence. First, they claim the prosecutor should have complied with CR 45(c) service requirements, instead of mailing the subpoenas, relying on State v. Adamski, 111 Wash.2d 574, 761 P.2d 621 (1988). Yet Adamski does not apply here because the Adamski prosecutor knew where to locate the key witness but still failed to produce him. See id. at 576, 761 P.2d 621. Furthermore, the Adamski court tested prosecutorial due diligence needed to support a continuance beyond the speedy trial date, not witness unavailability needed to support a hearsay exception. Id. at 577, 761 P.2d 621.
The defendants also argue that the State should have utilized the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, chapter 10.55 RCW (Uniform Act). Although resort to the Uniform Act is sometimes required to satisfy the good faith efforts test, State v. Sweeney, 45 Wash.App. 81, 86, 723 P.2d 551 (1986), it is applicable only where a witness is in another state and the prosecutor knows the witness's location. Dres v. Campoy, 784 F.2d 996, 999 (9th Cir.1986). The defendants also assert that "good faith" efforts should include all-points bulletins, use of the national crime computer, and surveillance of locations where witnesses might visit, relying on State v. Rivera, 51 Wash.App. 556, 560, 754 P.2d 701 (1988). However, the Rivera court did not compel such efforts in every case, id. at 560-61, 754 P.2d 701, and here the suggested additional efforts were unlikely to produce the witnesses. See Roberts, 448 U.S. at 76, 100 S.Ct. 2531. Given the State's inability to locate the witnesses after good faith and reasonable efforts, we hold that the witnesses were sufficiently unavailable to satisfy both the confrontation clause and ER 804.
2. Confrontation Clause Indicia of Reliability. The Roberts court held that the reliability requirement is satisfied without more where the proffered hearsay statement "falls within a firmly rooted hearsay exception." Roberts, 448 U.S. at 66, 100 S.Ct. 2531. The United States Supreme Court has recognized an "established rule that prior trial testimony is admissible upon retrial if the declarant becomes unavailable...." Id. at 68, 100 S.Ct. 2531 (citing Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); Mancusi, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293). Because all of the former testimony in this case occurred in a prior trial and the witnesses subsequently became unavailable, this rule is dispositive. Thus, we hold that, as a matter of law, there was no confrontation clause violation in this case.
*1070 3. ER 804(b)(1) Opportunity and Similar Motive. ER 804(b)(1) allows admission of former testimony only if the opposing party had "opportunity and similar motive to develop the testimony by ... cross ... examination." Here, whether the defendants had similar motive depends upon consideration of new evidence offered at the second trial and a new burglary charge. The new evidence claim is easily dismissed because the defendants failed to raise this issue at the evidentiary hearing, thereby waiving the argument. ER 103(a); see also State v. Coria, 146 Wash.2d 631, 641, 48 P.3d 980 (2002) (untimely objection to evidence waived).
The new burglary charge creates a closer question.[1] The new charge arguably produced a new or stronger motive to cross-examine Serrano, which was lacking in the first trial. Statements that the phone wires had been cut, the door had been damaged, and open sodas had been left in the kitchen were read to the jury in the second trial but Serrano was never cross-examined on these points.
It is proper to look at federal law where, as here, a Washington evidence rule is identical to the federal one. State v. Burton, 101 Wash.2d 1, 6, 676 P.2d 975 (1984), overruled on other grounds by State v. Brown, 111 Wash.2d 124, 761 P.2d 588 (1988); compare Fed.R.Evid. 804(b)(1) with ER 804(b)(1). Generally, a new indictment does not make former testimony inadmissible, so long as motive and incentive to cross-examine are substantially the same. 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 804.04[5], at 804-38 (2d ed.1999); see also United States v. Licavoli, 725 F.2d 1040, 1048-49 (6th Cir. 1984) (holding the additional "enterprise" element in a federal RICO prosecution that relied on testimony from a state murder trial did not preclude a finding of similar motive to cross-examine). Still courts have been justifiably concerned where the defendant had little incentive to cross-examine on a particular point in the first trial. See, e.g., United States v. Lombard, 72 F.3d 170, 172, 188 (1st Cir.1995) (worrying that the defendant had "little real incentive" in a state murder trial to attack prior testimony revealing the defendant owned the rifle because he was admittedly on a hunting trip at the time of the killing.)[2] Nevertheless, "`similar motive' does not mean `identical motive.'" United States v. Salerno, 505 U.S. 317, 326, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) (Blackmun, J., concurring).
Here, the defendants charged with burglary did not have reason to focus on Serrano's description of damage to the inside of the house when they faced only kidnapping charges. However, they did have some motive to discredit those statements because cut phone lines and damage to the door suggested criminal intentions, contrary to the defendants' assertions that their interaction with E. Sanchez was friendly. Therefore, we recognize that, as a matter of law, the trial court's admission of Serrano's testimony under ER 804(b)(1) was within the range of its discretionary choices. The trial court did not abuse its discretion when it admitted the former testimony. See Neal, 144 Wash.2d at 609, 30 P.3d 1255.

B. Sentence Enhancements
The standard range sentencing grid, RCW 9.94A.510(1), is enhanced by RCW 9.94A.510(3) if the defendant or an accomplice was armed with a firearm and by RCW 9.94A.510(4) if the defendant or accomplice was armed with a deadly weapon other than a firearm.[3] Before 1995, only one deadly weapon enhancement existed. The Hard Time for Armed Crime Act of 1995 (Initiative *1071 159) (Hard Time Act) removed "firearm" from the definition of "deadly weapon," and created an additional, more severe firearm enhancement. Laws of 1995, ch. 129, § 2.
If an offender is sentenced for more than one offense, "the firearm [or deadly weapon] enhancement or enhancements must be added to the total period of confinement for all offenses, regardless of which underlying offense is subject to a firearm [or deadly weapon] enhancement." RCW 9.94A.510(3), (4). In 1998, this court interpreted this to mean that while the statute required multiple sentence enhancements to run consecutive to base sentences, they could run concurrently to each other. In re Post Sentencing Review of Charles, 135 Wash.2d 239, 254, 955 P.2d 798 (1998). The legislature then amended the statute, adding the following emphasized language to subsection (e):
Notwithstanding any other provision of law, all ... enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements,....
RCW 9.94A.510(3)(e) (firearm) and RCW 9.94A.510(4)(e) (other deadly weapon) (emphasis added); Laws of 1998, ch. 235, § 1. Thus, all firearm and deadly weapon enhancements are mandatory and, where multiple enhancements are imposed, they must be served consecutively to base sentences and to any other enhancements.
RCW 9.94A.510(3)(g) (firearm) and (4)(g) (deadly weapon) place limitations on the total resulting sentence:
If the standard sentence range under this section exceeds the statutory maximum sentence for the offense, the statutory maximum sentence shall be the presumptive sentence unless the offender is a persistent offender. If the addition of a [firearm or deadly weapon] enhancement increases the sentence so that it would exceed the statutory maximum for the offense, the portion of the sentence representing the enhancement may not be reduced.
See also RCW 9.94A.599. Therefore, the total sentence, including enhancements, remains presumptively limited by the statutory maximum for the underlying offense unless the offender is a persistent offender. If the total sentence exceeds the maximum sentence provided in RCW 9A.20.021(1), the underlying sentence, not the enhancement, must be reduced.
Finally, RCW 9.94A.602, the statute calling for a special verdict where a defendant or accomplice was armed with a "deadly weapon," includes firearms in the definition of that term. When a fact finder determines that a defendant or accomplice was armed with a deadly weapon during a crime, the sentencing judge must then look to the enhancement statute to determine which enhancement(s) to apply. WASH. SENTENCING GUIDELINES COMM'N, ADULT SENTENCING GUIDELINES MANUAL 2000, at I-16. The special verdict statute does not differentiate between firearms and other deadly weapons, perhaps because it predates the Hard Time Act.
The issue is whether the standard range sentence for a single charge, here kidnapping, may be enhanced once by RCW 9.94A.510(3) because the defendant or an accomplice was armed with a firearm, and again by RCW 9.94A.510(4) because the same was also armed with a deadly weapon other than a firearm. The enhancement of a single charge with both a firearm enhancement and a deadly weapon enhancement is an issue of first impression for this court. Interpretation of a statute is a question of law subject to de novo review. Charles, 135 Wash.2d at 245, 955 P.2d 798.
In State v. Spandel, Division Two of the Court of Appeals affirmed imposition of one enhancement for each weapon carried during a single offense. 107 Wash.App. 352, 356-60, 27 P.3d 613, review denied 145 Wash.2d 1013, 37 P.3d 291 (2001). Sentenced for robbery, the defendant received a firearm enhancement for the shotgun he carried and a deadly weapon enhancement for the knife his accomplice displayed. Id. at 354, 356, 27 P.3d 613. The Spandel court held that the enhancements must be served consecutive to the base sentence and to each other. Id. at 360, *1072 27 P.3d 613. In doing so, the court accepted that the single charge of robbery could be enhanced twice, noting that multiple enhancements would combat the increased risk of injury that results from multiple weapons, as intended under Initiative 159. Id.
In contrast, Division Three of the Court of Appeals in this case interpreted RCW 9.94A.510[4] to impose one enhancement for each crime committed when the offender "was `armed,'" applying the two enhancement provisions in the alternative. DeSantiago, 108 Wash.App. at 880, 33 P.3d 394 (emphasis added). Under this interpretation, a crime committed with any weapon will be subject to enhancement; the longer enhancement will apply when the crime is committed with a firearm-but each crime is subject to only one enhancement. See State v. Rai, 97 Wash.App. 307, 312, 983 P.2d 712 (1999) (requiring the sentencing court to impose the longer enhancement where the weapon was a firearm). Division Three reasoned that the language of RCW 9.94A.510(3) and (4) supports this interpretation because it requires the court to enhance the standard range if the offender or an accomplice was armed with "`a' firearm" or "`a' deadly weapon." DeSantiago, 108 Wash.App. at 880, 33 P.3d 394 (emphasis added). "Nothing in [the plain language of] either subsection 3 or subsection 4 implies that additional time should be added based on the number of firearms or the number of deadly weapons [involved]." Id.
We disagree. The plain language of RCW 9.94A.510 not only anticipates the imposition of multiple enhancements under a single offense but clearly insists that all firearm and deadly weapon enhancements are "mandatory" and must be served consecutively:

Notwithstanding any other provision of law, all firearm [or deadly weapon] enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter.
RCW 9.94A.510(3)(e), (4)(e) (emphasis added). This plain language mandates that one enhancement must be applied for each firearm or other deadly weapon that a jury finds was carried by the offender or an accomplice during a crime. The fact that the special verdict statute does not require the jury to distinguish between firearms and other deadly weapons is immaterial. For each weapon found by special verdict, the sentencing judge must determine whether the weapon in question is a "firearm" or "other deadly weapon" and apply the appropriate corresponding enhancement. See RCW 9.94A.510(3)(e), (4)(e).
Division Three noted that the legislature required enhancement when the defendant or an accomplice was armed with "`a' firearm" or "`a' deadly weapon." DeSantiago, 108 Wash.App. at 880, 33 P.3d 394 (quoting RCW 9.94A.510(3), (4)). The court inferred from this language that the legislature did not intend enhancements to be added based on the number of firearms or deadly weapons present during the crime. See id. However, the legislature's decision to preface "firearm" and "deadly weapon" with "a" rather than "any" in fact supports the opposite conclusion; specifically, the legislature intended imposition of one enhancement for each weapon found by special verdict.
A majority of courts considering the meaning of "a weapon" or "a firearm" have interpreted "a" to mean that the defendant may be punished for "each" weapon involved. See, e.g., United States v. Alverson, 666 F.2d 341, 347 (9th Cir.1982); Grappin v. State, 450 So.2d 480, 482 (Fla.1984) ("[T]he phrase `to receive or possess a firearm' has been held to express a legislative intent to allow separate prosecutions for each firearm." "We find that the use of the article `a' in reference to `a firearm' ... clearly shows that the legislature intended to make each firearm a separate unit of prosecution."); State v. Nichols, 865 S.W.2d 435, 437 (Mo.App.1993) ("The plain and ordinary meaning of the word `a' is the singular `one.' Therefore, each knife which Defendant carried concealed *1073 upon or about his person is an allowable unit of prosecution."). But see People v. Haggart, 142 Mich.App. 330, 370 N.W.2d 345, 354 (1985). Although these cases did not analyze the statutory scheme at issue here, we find these straightforward interpretations of the plain meaning of identical statutory language, specifically the meaning of "a firearm," to be persuasive.
This court has also recognized a distinction between "a" and "any." State v. Westling, 145 Wash.2d 607, 610, 40 P.3d 669 (2002). In Westling, this court looked to the "plain language" of RCW 9A.48.030(1) to determine its meaning. Id. at 611-12, 40 P.3d 669. The statute provides that "[a] person is guilty of arson in the second degree if he [or she] knowingly and maliciously causes a fire ... which damages ... any ... automobile." RCW 9A.48.030(1) (emphasis added). Because "`any' means `every' and `all,'" the Westling court concluded that, even though the fire in that case had damaged several automobiles, the legislature's plain language reflected intent that a defendant be convicted only once when he set only one fire. Westling, 145 Wash.2d at 611-12, 40 P.3d 669. In contrast, the legislature in RCW 9.94A.510 (3) and (4) required enhancement, not for "any" firearm or deadly weapon, but for "a" firearm and "a" deadly weapon.
The above analyses occurred under the framework of the "unit of prosecution doctrine," an issue not raised by the defense in this case.[5] Nevertheless, we are faced with the same essential question here as those courts faced under the unit of prosecution framework: does the plain language of the statute indicate that the legislative body intended separate punishment, in this case in the form of a sentence enhancement, to be imposed for each weapon carried during an offense? We are convinced that, here too, the legislature intended "a firearm" to mean "each firearm." Therefore, we decline to follow Division Three's reasoning in this case and, given the plain language of RCW 9.94A.510(3)(e), (4)(e), we instead reach the opposite conclusion.
Nothing in the stated purpose of the Hard Time Act contradicts this interpretation. Division Three incorrectly reasoned that the stated purpose to "`[d]istinguish between the gun predators and criminals carrying other deadly weapons'" indicates that the legislature intended imposition of the enhancements in the alternative. DeSantiago, 108 Wash.App. at 881, 33 P.3d 394 (quoting Laws of 1995, ch 129, § 1(2)(c)). However, such a conclusion is contrary to the plain meaning of the statute. Furthermore, imposition of an enhancement for each weapon carried during an offense cannot be said to contradict this purpose because a gun-toting criminal receives a much greater enhancement for each firearm than a knife-wielding criminal receives for each knife. Compare RCW 9.94A.510(3)(a) (adding five years for use of a gun in a class A felony) with RCW 9.94A.510(4)(a) (adding two years for use of a nonfirearm deadly weapon in a class A felony). Furthermore, the Spandel court correctly reasoned that imposition of multiple enhancements would combat the increased risk of injury that results from multiple weapons, complying with the other stated purposes of Initiative 159 to "[s]tigmatize the carrying and use of any deadly weapons for all felonies" and "[r]educe the number of armed offenders by making the carrying and use of the deadly weapon not worth the sentence received upon conviction." Laws of 1995, ch. 129, § 1(2)(a), (b).
Finally, imposition of an enhancement for each firearm and each deadly weapon carried during an offense would not absurdly extend sentences as amicus and the defendants contend. Subsection (g) of each enhancement statute provides a presumption that the total sentence, including enhancements, cannot exceed that statutory maximum. RCW 9.94A.510(3)(g), (4)(g). Thus, the suggested absurdity is dissolved by a plain reading of the statute.
Therefore, the plain language of RCW 9.94A.510 requires a sentencing judge to impose an enhancement for each firearm or *1074 other deadly weapon that a jury finds was carried during an offense.

CONCLUSION
We affirm the Court of Appeals, holding that admission of the former testimony was proper, and we affirm the convictions. However, we reverse the Court of Appeals on its interpretation of the sentence enhancement statute. Therefore, we affirm the sentences imposed by the trial court for Diaz, Reyes, E. DeSantiago, and Carranza. However, we remand A. DeSantiago's case for resentencing in accordance with this holding.
IRELAND and CHAMBERS, JJ., and BRIDGE, J.P.T, and SMITH, J.P.T., concur.
MADSEN, J. (concurring/dissenting).
While I agree that the trial court did not abuse its discretion in admitting witnesses' testimony from Mr. DeSantiago's first trial, I do not agree that RCW 9.94A.510 unambiguously directs that the sentence for one offense may be enhanced by both a deadly weapon and a firearm enhancement. And, the majority's conclusion that multiple enhancements may be added for each deadly weapon other than a firearm and each firearm is even less convincing. Indeed, the majority must resort to cases involving units of prosecution, which have no bearing on the legislative intent underlying the sentence enhancement statute, because there is so little foundation for the majority's conclusion. Far from being clear, legislative intent cannot be discerned from the statutory language used or otherwise, and the rule of lenity therefore applies. Under that rule of construction, RCW 9.94A.510 should be read to mean that where only one offense is committed, only one enhancement for a deadly weapon or a firearm may be imposed. I respectfully dissent.

Analysis
Interpretation of a statute is a question of law reviewed de novo. In re Post Sentencing Review of Charles, 135 Wash.2d 239, 245, 249, 955 P.2d 798 (1998). When the language of a statute is plain, there is no room for judicial construction because legislative intent is determined solely from the language used. Bravo v. Dolsen Cos., 125 Wash.2d 745, 752, 888 P.2d 147 (1995). The court must, in that instance, give effect to that plain meaning. State v. J.M., 144 Wash.2d 472, 480, 28 P.3d 720 (2001). The same principles apply to statutes enacted through the initiative process. Charles, 135 Wash.2d at 249, 955 P.2d 798. Plain meaning is "discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." Dept of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11, 43 P.3d 4 (2002); see Charles, 135 Wash.2d at 249, 955 P.2d 798 (the statute is read in its entirety and its provisions are interpreted in light of one another; an original act and its amendments will be considered as if passed at the same time).
Far from a "plain meaning," what is apparent after reading RCW 9.94A.510 (formerly RCW 9.94A.310) and related statutes is that legislative intent is plainly unclear. RCW 9.94A.510(3) first provides for sentence enhancements where the offender or an accomplice was armed with a firearm and "is being sentenced for one of the crimes listed in this subsection as eligible for any firearm enhancements based on the classification of the completed felony crime." This language does not indicate whether multiple enhancements must be added in the case of one offenseit simply does not address the matter. It is consistent, I note, in referring to "enhancements," plural, in connection with a list of "crimes," also plural. RCW 9.94A.510(3) next states that "[i]f the offender is being sentenced for more than one offense, the firearm enhancement or enhancements must be added to the total period of confinement for all offenses, regardless of which underlying offense is subject to a firearm enhancement." (Emphasis added.) The emphasized language appears to contemplate the addition of only one enhancement for one underlying offense; otherwise, the statute should refer to possible "enhancements" for a single underlying offense.
RCW 9.94A.510(3)(e) provides that "[n]otwithstanding any other provision of law, all firearm enhancements under this section are *1075 mandatory ... and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter." This provision seems to clearly anticipate the possibility of multiple enhancements in the case of multiple offenses, but nothing in its language can be said to clearly speak to multiple enhancements where only one offense is concerned.
The provisions relating to deadly weapon enhancements are similarly ambiguous. Indeed, the language of RCW 9.94A.510(4) and 4(e) is parallel to that in subsections (3) and (3)(e), and I will not repeat the points made above.
In addition to the ambiguity present in RCW 9.94A.510, RCW 9.94A.602 (formerly RCW 9.94A.125) provides that where the special allegation of the accused or an accomplice being armed with a deadly weapon is made, "the court shall make a finding of fact of whether or not the accused or an accomplice was armed with a deadly weapon at the time of the commission of the crime," or, if it is a jury trial, the jury, if it returns a guilty verdict, "shall ... also find a special verdict as to whether or not the defendant or an accomplice was armed with a deadly weapon at the time of the commission of the crime." (Emphasis added.) "Deadly weapon" is defined to include firearms (this statute precedes enactment of Initiative 159 in 1995). This statute was not altered when Initiative 159 was enacted and must be read together with its provisions. Charles, 135 Wash.2d at 249, 955 P.2d 798; Campbell & Gwinn, 146 Wash.2d at 11, 43 P.3d 4. RCW 9.94A.602's references to findings of being armed with "a" deadly weapon at the time of "the crime" signifies intent that one enhancement is keyed to one offense. Moreover, the fact that the statute concerns both deadly weapon enhancements and firearm enhancements is particularly telling as to whether there is clear intent that both may be added where the conviction is for a single offense. There is no such intent apparent; to the contrary, the statute is more suggestive of one enhancement for one offense.
Against these provisions that do not answer the question, the majority relies solely on the language in RCW 9.94A.510(3) and (4) that requires a court to enhance the standard range if the offender or an accomplice was armed with "a firearm" or "a deadly weapon." However, rather than explaining how, in the context of all the other language in relevant provisions, these references mean that multiple enhancements are required if multiple deadly weapons or firearms are involved and only one offense committed, the majority sidesteps into unit of prosecution cases, relying on them for the illumination lacking in the statutes.
Unit of prosecution cases do not tell us what the legislative intent underlying RCW 9.94A.510 is. None of the cases cited by the majority concerns the mix of statutory language at issue here.
It is only fair to conclude, after examining the relevant provisions, that RCW 9.94A.510 is ambiguous on the question. A statute is ambiguous where it is susceptible to more than one reasonable interpretation. State v. Azpitarte, 140 Wash.2d 138, 141, 995 P.2d 31 (2000). It is clear that multiple enhancements may follow where there are multiple convictions. It is not at all clear whether multiple enhancements may follow where only one offense is committed. Indeed, from some of the language discussed above, it might be argued that if anything, the scales tip in favor of finding intent that only one enhancement may follow where one offense is committed.
The rule of lenity applies to resolve statutory ambiguities in criminal cases in favor of the defendant, absent legislative intent to the contrary. Charles, 135 Wash.2d at 250, 955 P.2d 798. The rule applies in the event of ambiguous Sentencing Reform Act of 1981 (RCW 9.94A) provisions. Id. Thus, if, aside from the language of the enactment, legislative intent can be gleaned from other sources resolving the ambiguity, the rule of lenity does not apply.
Legislative history does not resolve the ambiguity. Prior to enactment of Initiative 159, there was only one enhancement provision. The initiative's drafters simply copied the preexisting language from former RCW 9.94A.310 (1994) concerning the deadly weapon *1076 enhancement and substituted longer enhancement times where the firearm enhancement is concerned. Laws of 1995, ch. 129, § 2. In addition, as noted, former RCW 9.94A.125 (1983) (now RCW 9.94A.602) expressly referred, as it does now, to the trier of fact finding only that the offender or an accomplice was armed with a deadly weapon. The drafters did not alter this statutory provision. This history of the preexisting state of the law, the duplication of the existing language without alteration to former RCW 9.94A.125, and the lack of any clear mandate of enhancements for each deadly weapon or firearm show intent to create a more severe, longer enhancement where the offender or an accomplice was armed with a firearm. The history does not disclose any intent to require multiple enhancements in the case of a single offense.
The stated purposes of Initiative 159 also do not disclose any clear intent regarding whether multiple enhancements are intended where only a single offense is committed. In relevant part, they include: to stigmatize the carrying and use of any deadly weapons for all felonies; to reduce the number of armed offenders by making the carrying and use of a deadly weapon not worth the sentence; and to distinguish between gun predators and others carrying deadly weapons by the greater enhancements added for firearms. Laws of 1995, ch. 129, § 1. Each of these purposes is served by reading RCW 9.94A.510(3) and (4) to provide for only one enhancement in the event of one offense, and, if the offender or an accomplice was armed with a deadly weapon other than a firearm, and a firearm or multiple weapons including a firearm, to provide for adding the longer, more severe firearm enhancement.
It is arguable, though, that multiple enhancements could provide greater deterrent effect, and, to the extent the goal is harsher punishment in general, multiple enhancements added in the case of a single offense achieves a harsher punishment. On the other hand, Initiative 159 both increased penalties and expanded the range of crimes eligible for weapons enhancements, thus the stated purposes of the Hard Times for Armed Crime Act do not require that RCW 9.94A.510 be read to require multiple enhancements.
I would conclude that the ambiguity in RCW 9.94A.510 remains unresolved. Therefore, the rule of lenity should be applied, and where the offender, an accomplice, or both are armed with a firearm and a deadly weapon other than a firearm, or with multiple firearms or deadly weapons, only one enhancement should be added to the standard sentence. If one of the weapons is a firearm, then the longer firearm enhancement must be added, as that is plainly the intent of RCW 9.94A.510 and Initiative 159.
Finally, the majority's reliance on State v. Spandel, 107 Wash.App. 352, 27 P.3d 613 (2001) is misplaced. There, the defendant argued that multiple weapons enhancements for one offense should run concurrently rather than consecutively. Both the defendant and the court assumed that multiple enhancements were proper in the case of a single offense. There was no analysis of the issue.
For the reasons stated, I dissent in part.
JOHNSON, J., concurs.
SANDERS, J. (dissenting).
I concur in Justice Madsen's opinion that it is far from plain that RCW 9.92A.510 requires multiple sentence enhancements to apply to a single underlying offense. Concurrence/dissent at 3. But I write separately to examine the trial court's denial of a meaningful opportunity for the defendants to cross-examine the State's chief witnesses when it admitted the prior testimony of Eduardo Sanchez, Reina Serrano, and Jose Sanchez.
The rules of evidence and the confrontation clause prohibit the admission of witness testimony given at a prior hearing unless "the party against whom the testimony is ... offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." ER 804(b)(1); California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) ("[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant [was] testifying *1077 as a witness and subject to full and effective cross-examination.").
At the original trial of Armando DeSantiago, Enrique DeSantiago, Victor Diaz, Pedro Carranza, and Elpidio Reyes the defendants were charged with first degree kidnapping.[1] The trial resulted in a hung jury.
At the second trial the prosecution also charged Enrique DeSantiago, Diaz, Carranza, and Reyes with first degree burglary. However, the State's principal witnesses, the alleged kidnap victim Eduardo Sanchez, his wife Reina Serrano, and his father Jose Sanchez all fled the State prior to the second trial. So at that trial the prior testimony of these witnesses was read to the jury in their absence. That jury found Diaz, Carranza, and Reyes guilty of first degree kidnapping and burglary. Enrique DeSantiago was convicted only of first degree kidnapping, and Armando DeSantiago was convicted of first degree kidnapping and illegal possession of a firearm.
"`The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 John H. Wigmore, Evidence § 1395, at 123 (3d ed.1940)). A witness's former testimony is admissible if the party against whom the testimony is offered previously had an opportunity and similar motive to develop testimony by direct, cross, or redirect examination. ER 804(b)(1). However, a defendant does not have a similar motive to cross-examine witnesses if the testimony was taken before the defendant's charging document was amended to charge a different or additional offense. United States v. Wang, 964 F.2d 811, 814 (8th Cir.1992).
In Wang the government initially filed a criminal complaint charging the defendant with conspiracy to harbor illegal aliens; however, it later indicted the defendant for multiple counts of harboring illegal aliens. Id. at 812. The defendant and her attorney were present at the depositions and had an opportunity to cross-examine the witnesses, but the depositions took place before the defendant had been charged with harboring aliens. Id. After a jury returned a guilty verdict for three of the four counts of harboring illegal aliens,[2] the district court granted the defendant's motion for a new trial finding that the defendant's Sixth Amendment right to cross-examination had been violated by the admission of the videotaped testimony of two unavailable witnesses. Id. at 814. The district court reasoned that because the crimes of conspiracy and illegal harboring involved different elements,
the introduction of the depositions, which were taken when Wang was unaware of the ultimate charge for which she would be tried, squarely violated Wang's Sixth Amendment rights "to be informed of the nature and cause of the accusation [and] to be confronted with the witness[es] against [her]."
Id. (quoting United States Constitution amendment VI).
Here the defendants were not charged with burglary until the second trial. To prove kidnapping, the State must prove abduction of a victim through the use or threatened use of deadly force. RCW 9A.40.020,.010(2). To prove burglary, the State must show an illegal entry with the intent to commit a crime, elements not included in kidnapping. RCW 9A.52.020.
During Ms. Serrano's testimony the defendants did not cross-examine her on allegations that the door to her trailer had been damaged, the phone lines were cut, pictures had fallen from the wall, and there were open soda cans in the kitchen. Report of Proceedings at 439-43. Those allegations went to establishing illegal entry and intent to commit a crime, elements of burglary. Because *1078 the defendants did not have a motive to cross-examine Ms. Serrano about allegations supporting these elements, it was error to allow her testimony to be read to the jurors.
The majority cites United States v. Licavoli, 725 F.2d 1040, 1048-49 (6th Cir.1984) to support the proposition that a new indictment generally does not make former testimony inadmissible. Majority at 1070. But Licavoli is inapposite. There all six defendants were previously tried for murder in state court and subsequently convicted in federal court on racketeering charges. 725 F.2d at 1044. One of the witnesses at the state trial refused to testify at the federal trial, claiming the government had breached its plea agreement with him. Id. at 1047. The court found he was unavailable for the purposes of Fed.R.Evid. 804(a) and granted the government's motion to read his testimony. Id. at 1048. On appeal the defendants claimed it was error to allow the admission of this testimony because they did not have an opportunity and similar motive to cross-examine the witness at the state trial. Id. But the court held the defendants' motives for cross-examination at the state trials and the RICO trial "were nearly identical, since in the state cases the defendants were charged with murder and conspiracy to commit murder, and in the RICO prosecution these two acts constituted the predicate acts for the RICO conviction." Id.
But here the elements of burglary and kidnapping are substantially different and the defendants had little motive to cross-examine Ms. Serrano when she testified about damage to her home. Thus, the admission of her testimony violated ER 804(b)(1) and the confrontation clause.
Confrontation clause errors are subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Id. Ms. Serrano testified about the alleged abduction of Eduardo Sanchez and damage to her home. Majority at 1067. Other than her testimony, there was no evidence supporting the charges of burglary. Additionally her testimony supported the defendants' kidnapping convictions. Under the harmless error analysis, where tainted evidence tends to support one or more charges and convictions result, reversal is required even if some of the convictions are also supported by untainted evidence. Wang, 964 F.2d at 814. Because the erroneously admitted evidence tended to support both charges of burglary and kidnapping, I cannot conclude beyond a reasonable doubt these convictions were unaffected by the tainted evidence. Reversal of defendants' burglary and kidnapping convictions is required.
I therefore dissent.
ALEXANDER, C.J., concurs.
NOTES
[1] The official comment to ER 804(b)(1) does state that the use of former testimony "has been limited to proceedings on the same charge," citing State v. Lunsford, 163 Wash. 199, 300 P. 529 (1931). However, the facts in Lunsford do not support this proposition because no charges were added in Lunsford's second trial. Id. at 200, 300 P. 529.
[2] Ultimately, the Lombard court avoided the similar motive problem, finding any error to be harmless because the defendant himself had admitted to owning the rifle. Lombard, 72 F.3d at 188.
[3] RCW 9.94A.510 (3) and (4) are recodified at RCW 9.94A.533(3) and (4), effective July 1, 2004. The relevant language remains unchanged.
[4] When Division Three considered this question, the enhancement statute was codified at RCW 9.94A.310(3), (4). The relevant language remains identical.
[5] The unit of prosecution doctrine arises out of double jeopardy principles. It "protect[s] a defendant from being convicted more than once under the same statute if the defendant commits only one unit of the crime." Westling, 145 Wash.2d at 610, 40 P.3d 669.
[1] Armando and Enrique DeSantiago were also charged with leading organized crime. Armando DeSantiago Clerk's Papers (CP) No. 18759-4-III at 38; Enrique DeSantiago CP at 22. These charges were subsequently dismissed. Armando DeSantiago CP No. 18759-4-III at 109; Enrique DeSantiago CP at 80.
[2] Each of the four counts charged by the government correlated to a particular illegal alien. Wang, 964 F.2d at 812. Two illegal aliens testified live during the trial, while the testimony of the remaining two individuals was presented via the videotaped depositions. Id.